UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: |
| | : | |
| v. | : | |
| | : | VIOLATIONS: |
| LPPAI, LTD., | : | |
| doing business as PA, INC., | : | |
| | : | 50 U.S.C. §§ 1701-1706 |
| Defendant. | : | (International Emergency Economic |
| | : | Powers Act) |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions Regulations) |
| | : | 15 C.F.R. Parts 746 and 764 |
| | : | (Export Administration Regulations) |

**I N F O R M A T I O N**

The United States Attorney charges that:

**COUNT ONE**:
**Attempted Export Without an Export License**

At all times material to the Information:

1.  In February 2004, **PA, INC.**, was a Texas corporation with its principal place of business in Houston, Texas, incorporated in Texas, and engaged, in the United States and elsewhere, in the business of selling specialty alloy pipes, used *inter alia* in the oil and gas industry. **PA, INC.** had 10 or more employees.

2.  In or about February 2004, **PA, INC.** agreed to sell to Proclad International Pipelines, Ltd. ("Proclad"), a British company, $147,487.28 worth of specialty alloy pipes. Because **PA, INC.** did not have the total amount of the ordered pipes in stock, the parties agreed that **PA, INC.** would ship the pipes as they became available. The first shipment was for $33,653.13 worth of the specialty alloy pipes. Proclad provided **PA, INC.** with shipping paperwork (also known as "shipping marks") to include with the first shipment that indicated that the pipes were intended for a gas field development project in Iran.

The Licensing and Regulatory Structure

International Emergency Economic Powers Act (IEEPA)

3.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

4.      On March 15, 1995, the President issued Executive Order No. 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059, was in effect at all times relevant to this Information.

5.      Executive Orders No. 12959 and 13059 (the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

The Iranian Transactions Regulations

6.      The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

7.      Under the Iranian Transactions Regulations, 31 C.F.R. Part 560:

    a.    Section 560.204 provided that no goods, technology, or services may be exported, reexported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization.  31 C.F.R. § 560.204.

    b.    Section 560.203 prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560.  Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560.  31 C.F.R. § 560.203.

**PA, INC.**'s attempted export to Iran of its specialty alloy pipes was subject to the Iranian Transactions Regulations.

    8.    The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had responsibility for administering the Iranian Transactions Regulations, and was the entity empowered to authorize transactions with Iran during the embargo.  Such authorization, if granted, would be in the form of a license.

<u>The Export Adminstration Regulations (EAR)</u>

    9.    The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2401-2420, authorized the United States Secretary of Commerce to prohibit or curtail the export of any goods, technology, or software items, as necessary  to protect the national security, foreign policy, nonproliferation, and short-supply interests of the United States.  The Secretary of Commerce implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774.  Although the EAA had expired, the EAR continued to be in effect under the provisions of IEEPA, by virtue of Presidential Executive Order 13222 (August 17, 2001), as extended by Presidential Notice of August 7, 2003 (68 Fed. Reg. 47833).

    10.    The EAR identified items over which the United States Department of Commerce, through its Bureau of Industry and Security ("BIS") exercised regulatory jurisdiction. Items "subject to the EAR" included "all items in the United States" and "all U.S. origin items

wherever located." 15 C.F.R. § 734.3.  The EAR specifically provided that: "No person may export or reexport items subject to both the EAR and OFAC's Iranian Transactions Regulations without prior OFAC authorization." 15 C.F.R. § 746.7.

11. Under Part 764 of the EAR:

   a. Section 764.2(a) provided that no person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAA, the EAR, or any order, license, or authorization issued thereunder. 15 C.F.R. § 764.2(a).

   b. Section 764.2(b) provided that no person may cause or aid, abet, counsel, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. § 764.2(b).

   c. Section 764.2(c) provided that no person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. § 746.2(c).

   d. Section 764.2(d) provided that no person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. § 764.2(d).

   e. Section 764.2(e) provided that no person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any item exported or to be exported from the United States, or that was otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any order, license or authorization issued thereunder, has occurred, was about occur, or was intended to occur in connection with the item. 15 C.F.R. § 764.2(e).

**PA, INC.**'s attempted export to Iran of specialty alloy pipes was also subject to the Export

Administration Regulations.

12. In or about February 2004, within the District of Columbia and elsewhere, **PA, INC.** and others did knowingly and willfully attempt to export from the United States to Iran specialty alloy pipes, valued at $33,653.13, without obtaining an export license from the United States Department of the Treasury or any other agency located in the District of Columbia.

13. In March 2004, **PA, INC.**, converted to a Texas limited partnership under the name **LPPAI, LTD**. At the time of the conversion, **LPPAI, LTD.** assumed the name **PA, INC.**, and continued to do business under that name. At the time of the conversion, **LPPAI, LTD.**, assumed all of the liabilities and obligations of **PA, INC.**

(**Attempted Export Without an Export License**, in violation of Title 50, United States Code, Sections 1701-1705; Title 31, Code of Federal Regulations Part 560; and Title 15, Code of Federal Regulations Parts 746 and 764).

        KENNETH L. WAINSTEIN
        United States Attorney
        for the District of Columbia
        D.C. Bar No. 451058

By: _____
        Jonathan M. Malis
        D.C. Bar # 454548
        Assistant United States Attorney
        United States Attorney's Office
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 305-9665
        Jonathan.M.Malis@usdoj.gov

Dated: August 19, 2005