UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: 05-312 |
| | : | |
| v. | : | |
| | : | **FILED** |
| LPPAI, LTD., | : | SEP 1 5 2005 |
|   doing business as PA, INC., | : | NANCY MAYER WHITTINGTON, CLERK |
| | : | U.S. DISTRICT COURT |
| Defendant. | : | |

## FACTUAL PROFFER

Had this case gone to trial, the government would have proven beyond a reasonable doubt that:

1.     **PA, INC.** willfully attempted to export specialty alloy pipes to Iran without obtaining an export license from the United States Department of the Treasury or any other agency in the District of Columbia.

2.     **PA, INC.** was a Texas corporation with its principal place of business in Houston, Texas. **PA, INC.** had 10 or more employees, including an individual with substantial authority, that is, **PA, INC. Employee A**, who participated in and condoned the offense. **PA, INC. Employee A** was the Sales Manager for defendant **PA, INC.** during the conduct alleged in the Information. Proclad International Pipelines, Ltd. ("Proclad"), is a British corporation headquartered in Staffordshire, United Kingdom.

3.     The parties agree that the relevant law is set forth accurately in the Information. To summarize, the Iranian Transactions Regulations, 31 C.F.R. Part 560, issued pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., implemented Presidential Executive Orders imposing an embargo on Iran. The Iranian Transactions

Regulations prohibit any exportation, reexportation, sale or supply directly or indirectly from the United States or by a United States person, of any goods, technology or services to Iran without prior authorization from the United States Government. 31 C.F.R. § 560.204. They further prohibit the exportation, reexportation, sale or supply to a third country undertaken with knowledge or reason to know that the export is intended for Iran or for use in the production of, commingling with or for incorporation into goods, technology or services for Iran without prior authorization from the United States Government. Id. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, has responsibility for administering the Iranian Transactions Regulations, and is the entity empowered to authorize transactions with Iran during the embargo. Such authorization, if granted, would be in the form of a license.

4. The Export Administration Regulations, 15 C.F.R. Part 746, promulgated pursuant to the Export Administration Act, 50 U.S.C. App. § 2401 et seq. and kept in force under the International Emergency Economic Powers Act, prohibit exports subject to the Iranian Transactions Regulations without prior authorization from the U.S. Government. 15 C.F.R. § 746.7. Moreover, the Export Administration Regulations set forth certain other violations of the export controls, including aiding and abetting, conspiracy, evasion, acting with knowledge of a violation, attempt, and false statements, 15 C.F.R. §§ 764.2(a)-(h).

5. Sometime in early 2004, Proclad requested a bid from **PA, INC.** for the sale of specialty alloy pipes. On or about January 30, 2004, **PA, INC. Employee A** and **PA, INC. Employee B**, who was a junior sales associate of defendant **PA, INC.**, prepared a bid for the sale of the pipes to Proclad. On or about February 2, 2004, Proclad accepted the bid of **PA, INC.**,

2

and sent **PA, INC.**, a purchase order for $147,487.28 worth of specialty alloy pipes. Because **PA, INC.**, did not have the total amount of the ordered pipes in stock, the parties agreed that **PA, INC.**, would ship the pipes as they became available. The first shipment was for $33,653.13 worth of the specialty alloy pipes.

6.  On or about February 2, 2004, Proclad sent an email to **PA INC. Employee B**, which included shipping paperwork (also known as "shipping marks") to be included on the shipment. The shipping marks indicated the description of the goods to be shipped and had blank spaces to be filled in regarding the weights and dimensions of the shipment. The shipping marks also indicated that the pipes were intended for a gas field development project in Iran. Within a diamond shaped box, the shipping marks indicated the Iranian destination of the shipment as follows:

I.R. IRAN<br>
NIOC – PARS OIL & GAS<br>
ENI IRAN B.V. SOUTH PARS<br>
PHASE 4 & 5<br>
OFFSHORE FACILITIES<br>
FIELD DEVELOPMENT PROJECT<br>
HYUNDAI ENG & CONTR CO LTD.

**PA, INC. Employee C**, who was a warehouseman and sometime shipping clerk of **PA, INC.**, filled in the blank spaces regarding the weights and dimensions of the shipment and placed these shipping marks on the crates that **PA, INC.** used to pack the pipes for shipment.

7.  On or about February 10, 2004, **PA, INC.** delivered the crates containing the specialty alloy pipes, along with the shipping marks that indicated the Iranian destination of the shipment, to NNR Cargo, a freightforwarder designated by Proclad to process the export.

8.  On or about February 11, 2004, NNR Cargo's air freight manager reviewed the shipping documentation, including the shipping marks which indicated the Iranian destination,

and contacted **PA, INC.** NNR Cargo's air freight manager spoke with **PA, INC. Employee C** and asked him whether **PA, INC.** had a license to ship to Iran. **PA, INC. Employee C** responded that **PA, INC.** did not have an export license. NNR Cargo's air freight manager told **PA, INC. Employee C** that NNR Cargo could not handle the shipment. NNR Cargo's air freight manager indicated that, because of the U.S. embargo against Iran, it could not ship merchandise to Iran in the absence of a license. NNR Cargo's air freight manager indicated that the Iranian embargo covered direct or indirect shipments to Iran. NNR Cargo's air freight manager indicated that NNR Cargo would return the shipment to **PA, INC.**

9. On or about February 11, 2004, **PA, INC. Employee C** informed **PA, INC. Employee A** about his conversation with NNR Cargo's air freight manager, in particular NNR Cargo's refusal to handle the shipment because of the U.S. embargo against Iran. **PA, INC. Employee A** instructed **PA, INC. Employee B** to contact Proclad and arrange for another freightforwarder to handle the shipment.

10. On or about February 12, 2004, NNR Cargo's air freight manager spoke again with **PA, INC. Employee C** regarding the shipment. NNR Cargo's air freight manager reiterated that the planned shipment would be in violation of the U.S. embargo against Iran. **PA, INC. Employee C** indicated that **PA, INC.** would likely use a different freight forwarder to handle the shipment. NNR Cargo's air freight manager advised **PA, INC. Employee C** that **PA, INC.** should not go forward with the planned shipment because of its illegality.

11. On or about February 16, 2004, the shipment was returned from NNR Cargo to **PA, INC.** On or about February 17, 2004, **PA, INC.** delivered the crates containing the specialty alloy pipes, along with shipping documentation, to DFDS Transport, another freightforwarder designated by Proclad to process the export. The shipping documentation included the identical shipping marks, except that the references to Iran were deleted. Within a diamond shaped box, the shipping marks indicated the ultimate destination of

the shipment as follows:

PHASE 4 & 5
OFFSHORE FACILITIES
FIELD DEVELOPMENT PROJECT
HYUNDAI ENG & CONTR CO LTD.

12. On or about February 18, 2004, agents with the Department of Commerce detained the shipment at DFDS Transport, thereby preventing its export.

13. No licenses were applied for or obtained from the United States Department of Treasury or any other agency in the District of Columbia, for any of the dealings with Iran by **PA, INC.**

14. In March 2004, **PA, INC.**, converted to a Texas limited partnership under the name **LPPAI, LTD.** At the time of the conversion, **LPPAI, LTD.** assumed the name **PA, INC.**, and continued to do business under that name. At the time of the conversion, **LPPAI, LTD.**, assumed all of the liabilities and obligations of **PA, INC.**

KENNETH L. WAINSTEIN
United States Attorney
for the District of Columbia
D.C. Bar No. 451058

By: _____
Jonathan M. Malis
D.C. Bar # 454548
Assistant United States Attorney
United States Attorney's Office
Transnational/Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Dated: August 9, 2005

5

Defendant's Stipulation and Signature

I am the registered agent of LPPAI, LTD., a Texas limited partnership. I am also the Managing Member and President of GPPAI, LLC, a Texas limited liability company which is the sole general partner of LPPAI, LTD. I am authorized by LPPAI, LTD., to act on its behalf in this matter. Additionally, in February 2004, I was the President of PA, Inc., and owned 75% of all outstanding stocks and shares of PA, Inc.

On behalf of LPPAI, LTD., after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

LPPAI, LTD., a Texas limited partnership

8/12/05
Date

By: Sandford G. Baum, in his capacity as Registered Agent of LPPAI, LTD., acting as the Managing Member and President of GPPAI, LLC., acting as the sole general partner of LPPAI, LTD.

Attorney's Acknowledgment

I am counsel for LPPAI, LTD. I have carefully reviewed the above statement of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

8/15/05
Date

J. Triplett Mackintosh, Esq.
Counsel for Defendant LPPAI, LTD.