UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: 05-0312-01(ESH) |
| | : | |
| v. | : | |
| | : | Sentencing: December 16, 2005 |
| LPPAI, LTD., | : | |
| doing business as PA, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF RULE 11(c)(1)(C) PLEA AND SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its recommendation that the Court accept the parties' written plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and sentence defendant LPPAI, LTD., doing business as PA, Inc. ("LPPAI, LTD."), to a criminal fine of $50,000 and corporate probation of three years.

**PROCEDURAL BACKGROUND**

1. On September 15, 2005, pursuant to a written plea agreement with the United States, the defendant, through its organizational representative Sandford Baum, pled guilty to one felony count of a criminal Information, charging LPPAI, LTD. with Attempted Export without a License, in violation of 50 U.S.C. §§ 1701-1706; 31 CFR Part 560; and 15 CFR Parts 746 and 764.

2. Pursuant to the plea agreement, the defendant, through Mr. Baum, admitted its guilt to the offense conduct described in the factual proffer attached to that agreement.

3. Pursuant to Rule 11(c)(1)(C), the plea agreement provides for an agreed-upon sentence of a criminal fine of $50,000, and corporate probation of three years.  The plea

1

agreement provides that the defendant must pay the criminal fine in two equal annual installments: the first payment was required to made – and was, in fact, made – within thirty (30) days of the entry of the defendant's guilty plea; and the second payment shall be made no later than June 30, 2006.

4. The plea agreement provides for a three-year term of corporate probation. In addition to the general conditions of probation, the plea agreement provides for the following specific additional conditions of probation: (1) the defendant shall pay the sums set forth in the agreement; (2) at the direction of outside counsel, the defendant shall conduct semi-annual audits of its compliance with United States export control laws and disclose the results of those audits to the United States Department of Commerce, Bureau of Industry and Security, Houston Resident Office, upon completion of the audits; (3) the defendant's current Compliance Officer (Sandford G. Baum), its current Compliance Administrators (Helen Hensley and Wesley Hardy), and any other partners, officers, directors, and/or employees so designated shall each attend training in export control laws sponsored by the United States Department of Commerce, Bureau of Industry and Security, within one year of the entry of the defendant's guilty plea; and (4) pursuant to 18 U.S.C. § 3563(a)(1), the defendant shall not commit any federal, state or local crimes during the term of probation.

5. The plea agreement also refers to the civil fine and other civil sanctions to be imposed on the defendant for the conduct that gave rise to the criminal charge. Attached to the plea agreement filed with the Court, is a separate agreement between the defendant and the United States Department of Commerce regarding disposition of certain civil claims against the defendant. The two most significant terms of that separate agreement are: (1) the defendant's agreement to pay an

administrative fine of $50,000; and (2) the defendant's agreement to the entry of a five-year order denying the defendant export privileges, which order was immediately suspended. Moreover, as referenced directly in the criminal plea agreement, the defendant agrees not to contest the administrative forfeiture by the United States Department of Homeland Security, Customs and Border Protection, of the specialty alloy pipes seized in this investigation.

6. The Court deferred accepting the plea agreement until the date of the sentencing hearing.

## STIPULATED OFFENSE CONDUCT

7. **PA, INC.** willfully attempted to export specialty alloy pipes to Iran without obtaining an export license from the United States Department of the Treasury or any other agency in the District of Columbia, as required by law.

8. **PA, INC.** was a Texas corporation with its principal place of business in Houston, Texas. **PA, INC.** had 10 or more employees, including an individual with substantial authority, that is, **PA, INC. Employee A**, who participated in and condoned the offense. **PA, INC. Employee A** was the Sales Manager for defendant **PA, INC.** during the conduct alleged in the Information. Proclad International Pipelines, Ltd. ("Proclad"), is a British corporation headquartered in Staffordshire, United Kingdom.

9. Sometime in early 2004, Proclad requested a bid from **PA, INC.** for the sale of specialty alloy pipes. On or about January 30, 2004, **PA, INC. Employee A** and **PA, INC. Employee B**, who was a junior sales associate of defendant **PA, INC.**, prepared a bid for the sale of the pipes to Proclad. On or about February 2, 2004, Proclad accepted the bid of **PA, INC.**, and sent **PA, INC.**, a purchase order for $147,487.28 worth of specialty alloy pipes. Because

**PA, INC.**, did not have the total amount of the ordered pipes in stock, the parties agreed that **PA, INC.**, would ship the pipes as they became available. The first shipment was for $33,653.13 worth of the specialty alloy pipes.

    10. On or about February 2, 2004, Proclad sent an email to **PA INC. Employee B**, which included shipping paperwork (also known as "shipping marks") to be included on the shipment. The shipping marks indicated the description of the goods to be shipped and had blank spaces to be filled in regarding the weights and dimensions of the shipment. The shipping marks also indicated that the pipes were intended for a gas field development project in Iran. Within a diamond shaped box, the shipping marks indicated the Iranian destination of the shipment as follows:

> I.R. IRAN
> NIOC – PARS OIL & GAS
> ENI IRAN B.V. SOUTH PARS
> PHASE 4 & 5
> OFFSHORE FACILITIES
> FIELD DEVELOPMENT PROJECT
> HYUNDAI ENG & CONTR CO LTD.

**PA, INC. Employee C**, who was a warehouseman and sometime shipping clerk of **PA, INC.**, filled in the blank spaces regarding the weights and dimensions of the shipment and placed these shipping marks on the crates that **PA, INC.** used to pack the pipes for shipment.

    11. On or about February 10, 2004, **PA, INC.** delivered the crates containing the specialty alloy pipes, along with the shipping marks that indicated the Iranian destination of the shipment, to NNR Cargo, a freightforwarder designated by Proclad to process the export.

    12. On or about February 11, 2004, NNR Cargo's air freight manager reviewed the shipping documentation, including the shipping marks which indicated the Iranian destination,

and contacted **PA, INC.** NNR Cargo's air freight manager spoke with **PA, INC. Employee C** and asked him whether **PA, INC.** had a license to ship to Iran. **PA, INC. Employee C** responded that **PA, INC.** did not have an export license. NNR Cargo's air freight manager told **PA, INC. Employee C** that NNR Cargo could not handle the shipment. NNR Cargo's air freight manager indicated that, because of the U.S. embargo against Iran, it could not ship merchandise to Iran in the absence of a license. NNR Cargo's air freight manager indicated that the Iranian embargo covered direct or indirect shipments to Iran. NNR Cargo's air freight manager indicated that NNR Cargo would return the shipment to **PA, INC.**

13. On or about February 11, 2004, **PA, INC. Employee C** informed **PA, INC. Employee A** about his conversation with NNR Cargo's air freight manager, in particular NNR Cargo's refusal to handle the shipment because of the U.S. embargo against Iran. **PA, INC. Employee A** instructed **PA, INC. Employee B** to contact Proclad and arrange for another freightforwarder to handle the shipment.

14. On or about February 12, 2004, NNR Cargo's air freight manager spoke again with **PA, INC. Employee C** regarding the shipment. NNR Cargo's air freight manager reiterated that the planned shipment would be in violation of the U.S. embargo against Iran. **PA, INC. Employee C** indicated that **PA, INC.** would likely use a different freight forwarder to handle the shipment. NNR Cargo's air freight manager advised **PA, INC. Employee C** that **PA, INC.** should not go forward with the planned shipment because of its illegality.

15. On or about February 16, 2004, the shipment was returned from NNR Cargo to **PA, INC.** On or about February 17, 2004, **PA, INC.** delivered the crates containing the specialty alloy pipes, along with shipping documentation, to DFDS Transport, another freightforwarder

designated by Proclad to process the export. The shipping documentation included the identical shipping marks, except that the references to Iran were deleted. Within a diamond shaped box, the shipping marks indicated the ultimate destination of the shipment as follows:

PHASE 4 & 5
OFFSHORE FACILITIES
FIELD DEVELOPMENT PROJECT
HYUNDAI ENG & CONTR CO LTD.

16. On or about February 18, 2004, agents with the Department of Commerce detained the shipment at DFDS Transport, thereby preventing its export.

17. No licenses were applied for or obtained from the United States Department of Treasury or any other agency in the District of Columbia, for any of the dealings with Iran by **PA, INC.**, as required by law.

18. In March 2004, **PA, INC.**, converted to a Texas limited partnership under the name **LPPAI, LTD**. At the time of the conversion, **LPPAI, LTD.** assumed the name **PA, INC.**, and continued to do business under that name. Pursuant to Texas statutory law, **LPPAI, LTD.**, assumed all of the liabilities and obligations of **PA, INC.**

**CRIMINAL HISTORY**

19. Consistent with the Pre-Sentence Report, the United States has no information that the defendant has engaged in similar misconduct or other misconduct.

**MAXIMUM STATUTORY PENALTIES AND SENTENCING GUIDELINES**

20. For the defendant, as a corporate violator, the Attempted Export without a License count carries a maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c)(3), a maximum term of corporate probation of 5 years, pursuant to 18 U.S.C. § 3561. The defendant is

also required to pay a special assessment of $400 to the Clerk of the United States District Court.

21.     As provided in the Pre-Sentence Report, the United States Sentencing Guidelines do not apply to this case, because the applicable guideline, USSG § 2M5.1(a), is not listed under USSG § 8C2.1, which governs fines for organizations.  Therefore, pursuant to USSG § 8C2.10, the sentence is determined by applying 18 U.S.C. §§ 3553 and 3572.

## PLEA AND SENTENCING RECOMMENDATION

22.     The Court should accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant to a criminal fine of $50,000 and three-years of corporate probation, with the specific additional conditions of probations described above.

23.     The plea agreement is a fair resolution of this case.  The agreement gives the defendant the full benefit of its early acceptance of responsibility, by providing it with a lesser criminal fine than the Court might otherwise impose after a trial and conviction.  The agreement also benefits the United States, because it avoids the expense, time, and risk associated with trial by jury.

24.     The plea agreement is particularly appropriate in light of the overall resolution of this case. Combined with the separate agreement with the United States Department of Commerce, the defendant is required: (1) to pay a total penalty of $100,000 (half criminal, half administrative); (2) to forfeit the specialty alloy pipes that were seized in this case, which pipes were valued at $33,653.13; (2) to remain on criminal probation for three years, with specific conditions of probation designed to ensure compliance with all export control law requirements; and (3) to remain on "administrative probation" for five years, with the severe sanction of losing its export privileges as further incentive to ensure compliance with all export control law

requirements.

WHEREFORE, the government respectfully requests that the Court accept the parties' plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant to a criminal fine of $50,000 and three years of probation, with the specific additional conditions of probation provided in the plea agreement.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
D.C. BAR NUMBER 451058

_____
Jonathan M. Malis
D.C. Bar Number 454548
National Security Section
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Jonathan.M.Malis@usdoj.gov
(202) 305-9665 telephone
(202) 307-6059 facsimile

Dated: December 12, 2005

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing was caused to be served by U.S. Mail and facsimile on counsel of record for the defendant, J. Triplett Mackintosh, Esq., Holland & Hart, LLP, 555 17th Street, Suite 3200 Denver, CO 80202-3979, (303-295-8261 facsimile), this 12th day of December, 2005.

_____
Assistant United States Attorney